BARBER v. ELLINGWOOD et al.

(Supreme Court, Appellate Division, First Department. December 31, 1909.)

1. ACTION (§ 38*)—SINGLE CAUSE OF ACTION—WRONGFUL ACTS—SPECIAL CONTRACT.

The complaint alleged that defendants agreed to let plaintiff open an account with them for speculating on margins, on condition that they should not execute any orders for him in excess of the number of shares they were willing to carry without calling for additional margins, and that pursuant to the general custom in the brokerage business plaintiff should deposit part of the cost of all securities purchased by defendants for him, and that they should retain such securities as security for payment of the balance of the price which they agreed to advance, and that on a like deposit defendants should sell on plaintiff's account shares which he did not own and complete the sale by delivering shares borrowed by defendants, they retaining the proceeds of the sale as security, and receiving a certain commission for buying and selling for plaintiff; and that it was also agreed by the general custom of the brokerage business that all notices to plaintiff should be in writing, and that such custom was followed. The complaint further alleged that plaintiff deposited a certain sum with defendants as margins, and that they made certain unauthorized sales and purchases on plaintiff's account without notice to him, which he disaffirmed upon learning thereof and advised defendants that he did not have the money to replace the shares sold for him without authority, and that within a reasonable time after the unauthorized sales the market value of the stock sold was much greater than when sold, and within a reasonable time after the unauthorized purchases the market value of the stock purchased was much less than the price at which it was covered, and that plaintiff's damages caused by the unauthorized sales and purchases was a certain sum. *Held*, that the complaint stated but one cause of action, which was based upon the special agreement alleged to have been made with defendants.

[Ed. Note.—For other cases, see Action, Cent. Dig. § 549; Dec. Dig. § 38.*]

2. BROKERS (§ 38*)—ACTION FOR WRONGFUL ACTS—UNAUTHORIZED SALES—SUFFICIENCY OF EVIDENCE—SPECIAL CONTRACT.

In an action against brokers for damages caused by unauthorized purchases and sales of stock, weight of evidence *held* not to show that defendants made any special contract with plaintiff as to the purchase and sale of stocks on his account as alleged.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 33; Dec. Dig. § 38.*]

3. PRINCIPAL AND AGENT (§ 119*)—PRINCIPAL'S LIABILITY—AGENT'S AUTHORITY—NECESSITY OF SHOWING.

To make an employer liable on a contract made with an employé, the employé's authority to make such a contract must be shown.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 391–401; Dec. Dig. § 119.*]

4. PRINCIPAL AND AGENT (§ 103*)—AUTHORITY—SCOPE—EXECUTION OF CONTRACT.

Authority of a stock broker's clerk to stay in the outer office, meet customers as they come in, and receive and transmit orders over the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

telephone, does not authorize him to contract with a customer to let him open an account with the brokers for speculating on margins on condition that the brokers should not execute any orders for him in excess of the number of shares they were willing to carry without calling for additional margins, and by which the brokers should sell on the customer's account shares he did not own and complete the sale by delivering shares borrowed by them and retain the proceeds of the sale as security.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 278–293; Dec. Dig. § 103.*]

5. BROKERS (§ 38*)—ACTIONS FOR WRONGFUL SALE—JURY QUESTION—REASONABLE TIME OF PURCHASE.

Where, in an action against stock brokers for damages by the unauthorized sale of stock purchased for plaintiff, the facts were undisputed as to when plaintiff received notice of the sale and the market price of the stock thereafter, what was a reasonable time for plaintiffs to repurchase or determine whether he desired to repurchase the stock sold was a question of law, and it was error to leave it to the jury.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 34; Dec. Dig. § 38.*]

6. APPEAL AND ERROR (§ 878*)—REVIEW—QUESTIONS AFFECTING APPELLEE.

Questions which plaintiff might have raised had he appealed need not be considered on defendant's appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3573–3580; Dec. Dig. § 878.*]

Appeal from Trial Term, New York County.

Action by Clarence L. Barber against Charles H. Ellingwood and another. From a judgment for plaintiff and an order denying a motion for new trial, defendants appeal. Reversed, and new trial granted.

See, also, 130 App. Div. 555, 115 N. Y. Supp. 43.

Argued before PATTERSON, P. J., and INGRAHAM, LAUGHLIN, CLARKE, and SCOTT, JJ.

Duncan Edwards, for appellants.
James A. Deering, for respondent.

LAUGHLIN, J. The defendants are copartners conducting business as stock brokers in the city of New York under the firm name of "C. H. Ellingwood & Co." The plaintiff became one of their customers, and he brings this action with respect to transactions had with them, without making it entirely clear by the allegations of his complaint whether it is brought on the theory of conversion or of contract; but it should probably be regarded as an action to recover the damages sustained by the customer on account of breaches of the contract by the brokers. On a former appeal herein one of the members of the court expressed the view that it is an action on contract, but the court did not decide the question. 130 App. Div. 555, 115 N. Y. Supp. 43. He alleges a special and unusual contract made between the parties on the 15th day of January, 1906, by which he claims they agreed to let him open an account with them for speculating on margins, "on the condition then agreed to that defendants should not execute any orders on his account in excess of such number of shares as they were willing to carry without calling for additional margin." He then alleges that,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

agreeably to the general custom of the brokerage business, it was agreed that he should deposit with the defendants part of the cost of all securities purchased by them on his account, and that they should retain the securities as security for the payment of the balance of the purchase price, which they agreed to advance. The plaintiff further alleges that:

"On a like deposit, it was agreed that defendants should sell on plaintiff's account, shares which he did not own and complete the sale by delivering shares borrowed by them and retain the proceeds of the sale as security."

And he describes this as a "short sale."

It is further alleged that the defendants were to receive a commission of one-eighth of 1 per cent. for buying and a like commission for selling, and interest on that part of the purchase price advanced by them. It is further alleged that:

"It was also agreed by the general practice and custom of defendants and of other brokers in the city of New York that all notices to plaintiff should be given in writing, and said custom was followed."

According to the complaint, the plaintiff deposited with the defendant as margins between the 15th and 30th days of January, 1906, the sum of $9,000.

The plaintiff further alleges that on the 26th day of April, 1906, the defendants had purchased and were carrying in his account 400 shares of the stock of the Distillers' Securities Corporation, and on the 28th day of the same month had purchased and were carrying in his account 200 shares of common stock of the American Locomotive Company, and on said respective dates sold said stock; that on May 3, 1906, they had purchased and were carrying for him 10 debenture bonds series B of the Wabash Railroad Company, and on April 23d sold five of them, and on said May 3d, the other five (the evidence shows all of the bonds were sold on May 3d); that on the 2d day of April, 1906, defendants "were carrying for plaintiff, in his account, 200 shares of the stock of the Atchison, Topeka & Santa Fé Railway Company, which defendants had sold short for plaintiff," and on that day "they bought in and covered said 200 shares of the stock of the Atchison, Topeka & Santa Fé Railway Company at $95 per share by appropriating for that purpose 200 of said shares belonging to plaintiff and then under their control, whose cost price and real value was $95 per share, and whose market value was $90.87 per share"; and that on or about May 5, 1906, they were carrying for plaintiff in his account 200 shares of the stock of the Consolidated Gas Company which defendants had sold short for plaintiff, and on that day they bought in and covered said 200 shares of the stock of the Consolidated Gas Company at $137.75 per share; that all of said sales and purchases were made without notice to the plaintiff and without his authority; and that on learning thereof he disaffirmed the same and informed the defendants that he did not possess money or property readily convertible into money necessary to replace said shares in his account at that time.

The plaintiff then alleges that within a reasonable time after the unauthorized sales the market price of the stocks and bonds was much greater than that at which they were sold, and he specifies what it was;

that within a reasonable time "after said unauthorized purchase appropriation and covering" of the Atchison, Topeka & Santa Fé Company stock, its market value was $85.37 per share, which was much less than the price at which it was covered; and that within a reasonable time after the unauthorized purchase and covering of the Consolidated Gas Company stock its market value was $135 per share, which was much less than the price at which it was covered. The plaintiff alleges his loss "on account of said unauthorized purchases and sales" to be $10,-140.50, upon which he allows a credit of $418 for commissions, which he concedes the defendants were entitled to for buying and selling stocks and bonds, and interest which he concedes they would have been entitled to charge him, and he demands judgment for the balance, together with interest thereon from the 5th day of May, 1906.

No question with respect to the right of plaintiff to recover the margins is presented, although if such right exists it might have been litigated herein, and it would seem that a full adjustment of the damages would involve the right to the margins.

On the trial the plaintiff gave evidence tending to show that the account was opened on a special contract as alleged, and the case was tried and submitted to the jury upon that theory. The jury found with the plaintiff; but it is evident that he is dissatisfied with the amount of the verdict, although he has not appealed, for he claims that the court erred in limiting him to a recovery on the special contract, and that, even though he failed on that issue, he should have been permitted to recover as in an ordinary case where stocks are sold by brokers without notice to or demand upon the customer for further margins. The fact that both parties desire a new trial is not sufficient to authorize it; but the record presents grounds upon which we are able to accommodate them.

The plaintiff opened the account with one Cunningham, who was in the employ of the defendants as a clerk in the office. The plaintiff had none of his transactions with either of the defendants, and he had all of them with Cunningham. There is no evidence that either of the defendants had any knowledge of the making of this special contract, and Cunningham denies that it was made. The court submitted the question with respect to Cunningham's authority to the jury as one of fact under general instructions that the defendants were responsible for his acts within the apparent scope of the business intrusted to him. The evidence with respect to Cunningham's authority adduced in behalf of the plaintiff related to the transactions between him and Cunningham, and to transactions Cunningham had with other customers in his presence. This was shown by conversations over the telephone in the presence of plaintiff, in which Cunningham was apparently taking orders and giving directions to other employés in the office in regard to them. This evidence, standing alone, would have been insufficient to make it a question of fact for the jury as to whether Cunningham had authority to make the special and extraordinary contract which it is claimed he made; but the testimony of the defendant Ellingwood was probably sufficient to take the question to the jury, for he testified, among other things, with respect to Cunningham's authority, as follows:

"He was an employé for the purpose of getting customers and transacting any business in connection with the firm that came into the office."

He also testified that Cunningham had solicited several customers for the firm. We are of opinion, however, that the finding of the jury that such a special contract was made is clearly against the weight of evidence. It is not only denied by Cunningham, but it is impeached by the fact that the plaintiff received, without protest, numerous notices from defendants containing the usual provision that it was mutually understood and agreed that the brokers were authorized to sell without notice when they deemed such course necessary for their own protection, and by the further fact that the plaintiff testified that, when the panic caused by the earthquake at San Francisco was on, he called on Cunningham and asked "how long he would carry me before he closed me out." This necessitates granting a new trial; but, other grounds having been argued which will necessarily arise upon a new trial, we deem it proper to express our views thereon.

There is no substantial conflict in the evidence with respect to the market price of the different securities which the defendants were carrying for the plaintiff, both long and short. The learned trial judge, instead of deciding on this evidence, as matter of law, what was a reasonable time for the plaintiff to repurchase or determine whether he wished to repurchase the stocks and securities which the defendants were carrying for him, long, left that question as one of fact for the jury, under a charge which permitted the jury to award to the plaintiff the highest market price thereof for the 30 days succeeding the alleged unauthorized sales. There was evidence with respect to the market price of the stocks for the succeeding 30 days. The evidence with respect to the market price of the bonds consisted of the allegations of the complaint which showed their price on these days and were admitted and evidence covering a period of 15 days succeeding the alleged unauthorized sales. The latter evidence was most general in its nature, merely giving the highest and lowest price by the week for the two weeks succeeding the alleged unauthorized sales. Exception was duly taken by the counsel for the appellant, who then contended, as he does on this appeal, that the question of reasonable time was one of law for the court. Counsel for the respondent now joins in that view. We are of opinion that the court erred in this regard, and that, the facts being undisputed, the court should have decided what was a reasonable time and the price which was to be regarded as the highest price as the basis for determining the amount of the recovery. Burhorn v. Lockwood, 71 App. Div. 301, 75 N. Y. Supp. 828; Hurt v. Miller, 120 App. Div. 833, 105 N. Y. Supp. 775; Mullen v. Quinlan & Co., 195 N. Y. 109, 87 N. E. 1078.

The plaintiff testifies that he was informed by Cunningham, three or four days before May 4, 1906, of the sale of the Distillers' Company stock. He testifies that he at once repudiated the sale, and that Cunningham promised to take them up, which is claimed was in effect a promise to repurchase the stock when the effect of the panic was over or when the market settled, and that he had another conversation with him on the 4th of May concerning it, in which he drew Cunning-

ham's attention to the fact that this stock was then quoted at 54, and requested that Cunningham take the matter up, and Cunningham replied that he wanted to wait to see which way the general market was going. On every day from the time of the sale of the Distillers' Company stock until the 5th day of May thereafter, it could have been purchased at a lower price than that at which it was sold, so that the plaintiff would have sustained no loss. According to the complaint, the plaintiff evidently did not need any time to repurchase the stock or to determine whether or not he desired to repurchase it. They are to the effect that he notified defendants:

"That he did not possess money or property readily convertible into money necessary to replace said shares in his account at that time."

This indicates that he did determine that he was unable to repurchase the stock, and, if so, he needed no more time. It cannot be determined from the verdict what time the jury regarded as a reasonable time after the sale, the price on which day was to be taken as the basis of arriving at a verdict. According to testimony introduced by the defendant, the plaintiff received immediate notice of the sale of this stock. We are of opinion that the jury should have been instructed that, if the plaintiff received immediate notice of the sale, a reasonable time elapsed for him to repurchase or to decide whether he desired to repurchase, before the price went above the price at which it was sold, so that on that theory he would have sustained no damage.

The principal contention on the part of the defendants with respect to the Locomotive Company stock, as with respect to the Distillers' Company stock, was that they had express authority from the plaintiff to sell, and while numerous notices of sales purporting to be issued by the defendants addressed to the plaintiff on the day of the sales, which were produced by the plaintiff, were offered in evidence by the defendants, yet it was not specifically shown when they were delivered or mailed. There were also several monthly statements rendered to the plaintiff by the defendants introduced in evidence which showed the transactions in the account during the preceding month, which statements included all of the transactions of which the plaintiff now complains. The plaintiff testified that he received no notice of or statement of account of sales showing the sale of any of these securities until the middle of July thereafter; but he modified this testimony by saying that the statement of account showing the alleged unauthorized sales of the Distillers' Corporation stock and the Locomotive Company stock might have reached his office about the 1st of May, but had not come to his personal attention. The market price of the Locomotive Company stock remained below the selling price for a period of five days after the alleged unauthorized sale of it by the defendants. In our opinion it was important to determine when the plaintiff received notice of these various sales, because the reasonable time given to him, after repudiating the sale, to repurchase or determine whether or not he desires to repurchase in the event of the failure of the brokers to restore the stock, necessarily depends upon knowledge on his part that there has been a sale.

With respect to the bonds, the alleged unauthorized sale occurred on May 3, 1906. The plaintiff evidently assumed that a reasonable time would not elapse until the 16th day of May, or 13 days thereafter, for he alleges in his complaint that the market value of these securities within a reasonable time after their sale was much greater than that for which they were sold, and with respect to the bonds he then states their market value on the 16th and 31st days of May and the 6th day of June, 1906. The allegations of the complaint with respect to the market price of the bonds on those days were admitted, and they constitute the plaintiff's evidence on that point. The defendants, however, showed the highest and lowest price at which these bonds sold during the two weeks ending May 11 and May 18, 1906, but did not show what the price was on any particular day. The daily prices should have been given, for on the record before us there is nothing to show that a week or more was required by the plaintiff for the determination of the question as to whether he desired to repurchase, or that he did not determine it sooner. With respect to the stocks which the defendants were carrying short for the plaintiff, we are of opinion that the court erred in instructing the jury as to the measure of damages. On the complaint and on the theory upon which the action was tried, the defendants were without authority to purchase to cover the short sales until directed by the plaintiff so to do. Ordinarily the measure of damages with respect to such a transaction would be the difference between the price at which the broker sold the stock short and credited the customer with and its market price at the time the customer gave them notice to purchase and cover the sale, making allowance for commissions and interest, as that would constitute his profits, if any, on the transaction or in other transactions. White v. Smith, 54 N. Y. 522; Campbell v. Wright, 118 N. Y. 594, 23 N. E. 914; Lazare v. Allen, 20 App. Div. 616, 47 N. Y. Supp. 340; Dos Passos on Stock Brokers and Stock Exchange (2d Ed.) pp. 325, 916.

In Rogers v. Wiley et al., 131 N. Y. 527, 30 N. E. 582, Judge Maynard, writing the opinion of the court from which Judge Gray dissented, said with respect to the question of damages:

"We see no error in the measure of damages adopted by the trial court, which was the difference between the amount paid by the defendants upon the unauthorized purchase of the stock August 15, 1882, and what it might have been bought for February 10, 1883, when plaintiff gave the direction to buy. It was the rule sanctioned by this court in Campbell v. Wright, 118 N. Y. 594 [23 N. E. 914]."

The case of Campbell v. Wright, referred to in the opinion of Judge Maynard, was one involving a short sale. It was there expressly stated that the customer could disregard the action of the broker in purchasing stock to cover the short sale without authority, and a recovery was had of the amount of the margins which the customer would have had to his credit with the brokers had it not been for their unauthorized action in charging the account with the purchase price of the stocks thus bought without authority. The profit that would have been made had the brokers executed the order to purchase at the time the customer directed them to do so would, in that case, have merely covered the commissions of the brokers. The trial court instructed the jury

that it was immaterial whether the action was upon contract or for conversion, and the Court of Appeals, without deciding what the nature of the action was, say in their opinion that this charge was not prejudicial to the defendants, for, on the facts being found in favor of the plaintiff, the verdict was warranted.

While Rogers v. Wiley proceeded upon a different theory in arriving at the plaintiff's damages, it is not to be inferred, in view of the statement in the opinion, that the court intended to prescribe a different rule from that sustained by the other authorities herein cited. The fair inference is, I think, although it does not appear from the opinion, that Rogers v. Wiley was sustained upon the theory that it was an action to recover the damages sustained by the customer which would be represented by the balance of the account owing by the brokers to the customer, not as the account stood on the books of the brokers, wherein the customer had been charged without authority for the purchase of stock to cover short sales, but for the balance of the account as it would have been had the brokers not purchased without authority to cover short sales, but had obeyed the directions of the customer with respect to purchasing stock for such purpose. The action was in effect to recover the damages which the customer had sustained by a breach of contract on the part of the brokers in appropriating moneys standing to his credit in their hands by purchasing stock therewith without authority to cover short sales. On that theory the rule is consistent with the other cases cited. The result seems to be the same whether you accept the purchase as made by the brokers without authority, and which they presumably charged to the customer, and use that as a basis for figuring, modifying it by the price at which they should have purchased when duly directed to do so, or disregard their unauthorized purchase and adjust the accounts by determining the difference between the price at which the sale was made short and the price at which the securities might have been purchased to cover when the customer gave the direction to purchase, making due allowance for commissions and interest—which seems to have been done in most of the printed cases. Wright v. Bank of Metropolis, 110 N. Y. 237, 249, 18 N. E. 79, 1 L. R. A. 289, 6 Am. St. Rep. 356; Baker v. Drake, 66 N. Y. 518–524, 23 Am. Rep. 80; s. c. 53 N. Y. 211–216, 13 Am. Rep. 507.

It is manifest that where a broker purchases stock to cover a short sale there is no conversion of the customer's stock, and the action in that regard must necessarily rest upon contract express or implied. If the purchase be made without authority, it certainly does not concern the customer unless the broker has appropriated funds of the customer with which to make the purchase, in which case that might give rise to a cause of action for a conversion of the funds or for money had and received. In the case at bar there is no evidence that the customer directed the brokers to purchase stock to cover these short sales. The court in submitting the case to the jury instructed them, in effect, that the rule with respect to reasonable time applied as well to the short as to the long transactions, and that in the former case the plaintiff was entitled to recover the difference between the price which the

brokers paid on the unauthorized purchases to cover short sales and the lowest price of the stocks for a reasonable time thereafter.

No case has been cited, and we find none, applying this rule to sales short. All of the cases lay down the rule that the customer may ignore the unauthorized purchase by the broker, and that it cannot affect his rights, which are to have the short sale transaction carried for him until he gives an order to the broker to purchase stock to cover such sale, subject, however, to the right of the broker in the meantime to be protected by margins and to require additional margins when necessary by reasonable notice and to sell on reasonable notice as to time and place in the event that the customer fails to put up the necessary margin, and to the right also of the broker to close the account with respect to any particular security, on notice, after it has been carried for a reasonable time, which is the implied contract arising between the broker and the customer owing to the nature of the transaction. White v. Smith, supra; Campbell v. Wright, supra; Rogers v. Wiley et al., supra; Lazare v. Allen, supra. See, also, Content v. Banner, 184 N. Y. 121, 76 N. E. 913.

Unless, therefore, notice of the unauthorized purchase to cover a short sale is equivalent to notice that the broker demands that the customer close the account with respect to that security, there would seem to be no ground for applying the rule of reasonable time to a short sale. Of course, the relations of the parties or the circumstances might be such as to show that the broker did not wish to carry the account any longer; but the mere fact that he makes an unauthorized purchase to cover a short sale is, I think, alone insufficient, for that course might have been taken and usually is taken on account of insufficient margins, or a feeling of insecurity with respect to the margins. This question has not been argued, and we therefore should refrain from expressing a decided opinion thereon. We only intend to suggest that the adjudicated cases have not been followed, and to draw attention to the difficulties that may be met with along the lines on which this case was tried.

It follows, therefore, that the judgment and order should be reversed, and a new trial granted, with costs to appellant to abide the event.

PATTERSON, P. J., concurs.

SCOTT, J. The complaint states but a single cause of action, and that is based upon the special agreement alleged to have been made between plaintiff and Cunningham, the defendants' clerk. Plaintiff might have pleaded an alternative cause of action based upon the general rules relating to stock broking contracts, but he did not do so. As to the special agreement, the weight of the evidence and the probabilities of the case are that it was not made. But even if Cunningham had assumed to make such an unusual contract for his employers, it would still be necessary to show his authority. Of that there was, as I read this case, no evidence. It certainly is not to be inferred from the fact that his duty was to stay in the outer office, meet customers as they

came in, and receive and transmit orders over the telephone. I agree with Mr. Justice LAUGHLIN that the question of reasonable time, if that question became important, was one of law to be determined by the court.

It seems to me to be unnecessary to consider any question that plaintiff might have raised if he had appealed, or any question, other than this above mentioned, which may arise upon the new trial.

INGRAHAM and CLARKE, JJ., concur.

---

## SABATINO v. ROEBLING CONST. CO.

(Supreme Court, Appellate Division, Fourth Department. January 12, 1910.)

1. MASTER AND SERVANT (§ '278*)—INJURY TO SERVANT—EVIDENCE OF NEGLIGENCE.

Evidence in an action for injuries to a servant *held* insufficient to show that the injuries were caused by the negligence of the master, though the elevator shaft about which plaintiff was employed was not guarded as required by law.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 950, 952, 954, 959, 970, 976; Dec. Dig. § 278.*]

2. MASTER AND SERVANT (§ 217*)—INJURY TO SERVANT—ASSUMPTION OF RISK.

A servant, who remained at work about an elevator shaft which was not guarded by barriers as required by law, assumed the risk of injury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 574–600; Dec. Dig. § 217.*]

Spring, J., dissenting.

Appeal from Trial Term, Monroe County.

